1 | Arif Virji, Esq. (SBN 130322)
avirji@cmprlaw.com
2 | James V. Sansone, Esq. (SBN 244671)
jsansone@cmprlaw.com
3 | CARLE, MACKIE, POWER & ROSS LLP
100 B Street, Suite 400
4 | Santa Rosa, California 95401
Telephone: (707) 526-4200
5 | Facsimile: (707) 526-4707

6 | Attorneys for IEE INDOOR ENVIRONMENTAL ENGINEERING

7 |

8 | UNITED STATES DISTRICT COURT

9 | NORTHERN DISTRICT OF CALIFORNIA

10 | OAKLAND DIVISION

11 | GLOBAL PLASMA SOLUTIONS, INC.,

Case No: 21-cv-02884-JSW

12 | Plaintiff,

**DEFENDANT IEE INDOOR
ENVIRONMENTAL ENGINEERING'S**
13 | v.
**MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF**
14 | IEE INDOOR ENVIRONMENTAL
**MOTION TO STRIKE COMPLAINT BY
GLOBAL PLASMA SOLUTIONS, INC.**
ENGINEERING,
15 | **(Anti-SLAPP)**

Defendants.
16 | [California Code of Civil Procedure §425.16]

17 | Date:   November 5, 2021
18 | Time:  9:00 a.m.
Courtroom:    5

19 |
Complaint Filed: April 21, 2021
20 | Trial Date:   January 23, 2023

21 | Assigned Judge: Hon. Jeffrey S. White

22 |

23 |

24 |

25 |

26 |

27 |

28 |

CARLE, MACKIE,
POWER & ROSS LLP

## TABLE OF CONTENTS

I.     INTRODUCTION ............................................................................................... 1

II.    STATEMENT OF FACTS ................................................................................. 3

     A.    Types Of Air Cleaner/Purifier Technologies ........................................ 3

     B.    GPS's Foray Into The Marketing And Sale Of Ionizers ....................... 3

     C.    The Growing Concern About Air Cleaners In The Covid-19 Era ........ 4

     D.    The Tests Presented On The GPS Website .............................................. 5

          1.    Evaluation Of Particle Removal Testing – Blue Haven
              Technologies Report ................................................................... 5

          2.    Evaluation of Antimicrobial Activity of Cold Plasma
              Generator Test ............................................................................ 6

          3.    Pathogen Testing Reports (Four tests) ..................................... 6

          4.    Customer Site Testing Reports ................................................... 7

     E.    The Offermann Article ............................................................................ 7

III.   LEGAL STANDARD ......................................................................................... 8

     A.    This Court Has The Authority To Consider The Anti-Slapp Motion .............. 8

     B.    California Law Mandates That Slapp Claims Are Not Actionable As
         A Matter Of Law ..................................................................................... 8

IV.   ARGUMENT ..................................................................................................... 10

     A.    IEE's Claims Are Based On Writings Made In Connection With An
         Issue Of Public Interest ......................................................................... 10

     B.    Plaintiff Cannot Show A Probability Of Succeeding On The Merits Of
         Its Trade Libel, Libel, And Slander Causes Of Action .................................. 10

     C.    Plaintiff's Causes Of Action For Product Disparagement And
         Violation Of Business And Professions Code § 17200 Also Arise From
         Activity Protected By The Anti-SLAAP Statute ................................... 12

     D.    Plaintiff Cannot Show A Probability Of Succeeding On The Merits Of
         Its Product Disparagement And Violation Of Business And
         Professions Code § 17200 Causes Of Action ...................................... 12

     E.    IEE Is Entitled To Recover Attorneys' Fees ...................................... 13

V.    CONCLUSION ................................................................................................. 13

CARLE, MACKIE,
POWER & ROSS LLP

i

CASE NO. 21-CV-02884-JSW   DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION TO STRIKE
COMPLAINT BY PLAINTIFF (ANTI-SLAPP)

# TABLE OF AUTHORITIES

**Cases**

*Baker v. Los Angeles Herald Examiner* (1986)
    42 Cal.3d 254 ................................................................................................ 11

*Cotati v. Cashman* (2002)
    29 Cal. 4th 69 .................................................................................................. 9

*Eisenberg v. Alameda Newspapers, Inc.* (1999)
    74 Cal.App.4th 1358 ....................................................................................... 11

*Equilon Enters. v. Consumer Cause, Inc.* (2002)
    29 Cal. 4th 53 .................................................................................................. 9

*Flately v. Mauro* (2006)
    39 Cal. 4th 299 .......................................................................................... 10, 12

*Fox Searchlight Pictures, Inc. v. Paladino* (2001)
    89 Cal App. 4th 294 ........................................................................................ 12

*Franklin v. Dynamic Details, Inc.* (2004)
    116 Cal.App.4th 375 ....................................................................................... 11

*Letter Carriers v. Austin* (1974)
    418 U.S. 264 .................................................................................................... 10

*Metabolife Int'l v. Wornick* (9th Cir. 2001)
    264 F.3d 832 .................................................................................................... 10

*Milkovich v. Lorain Journal Co.* (1990)
    497 U.S. 1 ........................................................................................................ 10

*Nevallier v. Sletten* (2002)
    29 Cal. 4th 82 ................................................................................................... 9

*Nygard, Inc. v. Uusi-Kerttula* (2008)
    159 Cal. App. 4th 1027 ................................................................................... 10

*Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP* (2005)
    133 Cal. App. 4th 658 ..................................................................................... 12

*United States ex rel. Newsham v. Lockheed Missiles & Space Co.* (9th Cir. 1999)
    190 F.3d 963 ...................................................................................................... 8

**Statutes**

Cal. Code Civ. Proc. § 425.16(a) ......................................................................... 9

Cal. Code Civ. Proc. § 425.16(b) ......................................................................... 9

Cal. Code Civ. Proc. § 425.16 .............................................................................. 9

Cal. Code Civ. Proc. § 425.16(c) ....................................................................... 13

CARLE, MACKIE,
POWER & ROSS LLP

Cal. Code Civ. Proc. § 425.16(e) ..................................................................................... 9

**Treatises**

*Restatement (Second) of Torts § 566* ............................................................................... 11

CARLE, MACKIE,
POWER & ROSS LLP

iii

CASE NO. 21-CV-02884-JSW    DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION TO STRIKE
COMPLAINT BY PLAINTIFF (ANTI-SLAPP)

## I.   <u>INTRODUCTION</u>

Francis (Bud) J. Offermann is president of IEE, a San Francisco based Indoor Air Quality (IAQ) consulting firm and the Defendant in this action.  He has 30 years of experience as an IAQ scientist, following his graduation from Rensselaer Polytechnic Institute in 1976 (B.S. - Mechanical Engineering) and from Stanford University in 1985 (M.S. - Mechanical Engineering). He is an active member of numerous professional engineering organizations, including the indoor air quality committees of the American Society of Heating, Refrigeration and Air Conditioning Engineers (ASHRAE) and Cal-OSHA.  Before starting up IEE, Mr. Offermann worked as an engineer for several engineering companies and was a Staff Scientist with the Building Ventilation and Indoor Air Quality Program at Lawrence Berkeley Laboratory.  He has published extensively and lectured frequently about IAQ, ventilation, air cleaning, and product emission testing.  In short, Mr. Offermann has spent almost *the last half century* immersed in the exploration and improvement of indoor air quality for people in commercial, school and home environments. [Declaration of Francis (Bud) J. Offermann (herein "Offermann Decl." ¶s 1 - 7)]

With the start of the COVID-19 pandemic, Mr. Offermann, along with many other IAC scientists, noticed an explosion of manufacturers purporting to have air cleaners that they contended could remove greater than 98% of airborne virus and bacteria.  Having studied and tested air cleaners for decades, Mr. Offermann knew that (1) these "air cleaners" were not new and had been reincarnated many times since the early 1900's, and (2) based on his review of test data from many of these types of devices in the past, he had never found that they significantly removed air contaminants from indoor air and sometimes actually produced dangerous chemicals such as ozone, formaldehyde and ultra-fine particles. (Offermann Decl. ¶13)

Many of the new COVID era manufacturers, often armed with misleading "laboratory test data", directed their marketing campaigns at School Districts, which were desperately looking for ways to return students to classrooms safely and which had significant Federal and State COVID-19 remediation funding.  As a lifelong scientist dedicated to *real* improvements in indoor air quality, Mr. Offermann decided to investigate these claims of using additive devices, including ionizers, to reduce indoor concentrations of air contaminants, including bacteria and virus, with

CARLE, MACKIE,
POWER & ROSS LLP

1

CASE NO. 21-CV-02884-JSW   DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION TO STRIKE
COMPLAINT BY PLAINTIFF (ANTI-SLAPP)

the goal of educating parents and school administrators on this matter of great public interest.  He decided to focus his investigation on the products advertised and sold to school districts by Global Plasma Technologies ("GPS"), the Plaintiff in this case, because he had access to the data from six laboratory tests and six customer site tests, which GPS had posted on their website as part of their marketing campaign.  (Offermann Decl. ¶15)

After reviewing this GPS test data, Mr. Offermann reached the following conclusions: (1) four chamber tests to measure the GPS device's ability to remove harmful particles showed a Clean Air Delivery Rate (CADF) that ranged from 6 to 31 cubic ft/minute, which under industry standards *translates into removal of harmful particles from tiny rooms ranging in size from 9 square feet to 35 square feet, a fraction of the size of a typical bedroom, let alone a class room*; (2) in two tests conducted to determine the inactivation rate of virus and bacteria in petri dishes, GPS revealed a virus reduction of 87-94% but only when the GPS device was positioned 1 inch above the petri dish for 30 minutes; *the virus reduction rate was 0.002% when adjusted for real life application of a GPS device inside an HVAC system,* where airborne bacteria and virus pass through the GPS device at high speeds and are only exposed for less than 0.1 second; and (3) six "Customer Site Testing Reports" purportedly showed that GPS devices were working well at real customer sites, but they all lacked the necessary test controls for an accurate measurement of the improvement of air quality.  (Offermann Decl. ¶16)

Knowing that school districts were spending millions of taxpayer dollars on air cleaning devices that provide very minimal removal of harmful particles, Mr. Offermann wrote an article entitled *Beware The COVID-19 Snake Oil Salesmen Are Here*, which simply sets forth the results of his evaluation and calculations of the test results posted by GPS on their website.  There were no false, misleading, or otherwise defamatory statements in the article; it simply presented Mr. Offermann's opinion that many of the advertised air cleaning devices simply did not work, and, in the case of GPS, their own test data shows how ineffective their products are at keeping children safe from harmful air particles in classrooms.

In writing the article, Mr. Offermann had no goal other than to shine a light on this critical issue of public importance.  There was no profit motive as IEE does not manufacture any air

CARLE, MACKIE,
POWER & ROSS LLP

2

CASE NO. 21-CV-02884-JSW   DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION TO STRIKE
COMPLAINT BY PLAINTIFF (ANTI-SLAPP)

cleaning devices, nor is it affiliated with any manufacturers of air cleaning devices and is not a competitor of GPS.  (Offermann Decl. ¶19) For this act of civic and professional responsibility, Mr. Offermann was rewarded with this well-funded lawsuit by GPS, in a clear and determined effort to silence him.

## II.   STATEMENT OF FACTS

### A.   Types Of Air Cleaner/Purifier Technologies.

Air cleaner/purification technology, which has existed for many decades, can be divided into two categories: (1) subtractive (removal by filtration); and (2) additive (removal/inactivation by generation of ions, ozone, hydroxyl radicals, hydrogen peroxide).  Based on his 30 plus years of experience in the IAC industry, Mr. Offermann knew that subtractive devices (basically the use of industry approved air filters) were quite effective at air purification at a relatively low cost, but that additive air cleaning/purification devices in general provide little removal/ inactivation, are expensive, and can create harmful air contaminants.  (Offermann Decl. ¶9)

The products sold and advertised by GPS fall in the additive category of devices using Ionizers (bipolar, negative).  Mr. Offermann was aware that these types of devices are only minimally effective and can create high indoor concentrations of ions, which recent studies have shown can cause adverse respiratory and cardiovascular effects and may create harmful air contaminants.  (Offermann Decl. ¶10)

### B.   GPS's Foray Into The Marketing And Sale Of Ionizers.

GPS was founded in 2008.  The company's previous focus was providing energy savings solutions.  However, when the COVID-19 pandemic hit, the company's focus shifted to the highly profitable market of air cleaners.  The backbone of Global Plasma Solutions' product line is its Needlepoint Bipolar Ionization technology (NPBI).  The GPS ionization system is an electrostatic ionization bar and power supply that is installed in the HVAC system.  GPS sells its NPBI purification devices to schools, hospitals, businesses, and homes.  (Offermann Decl. ¶11)

In marketing the products, GPS makes numerous representations to the public through a widespread marketing campaign coordinated to present universal representations concerning the effectiveness of GPS's products and the NPBI technology.  According to the GPS web page:

CARLE, MACKIE,
POWER & ROSS LLP

3

CASE NO. 21-CV-02884-JSW   DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION TO STRIKE
COMPLAINT BY PLAINTIFF (ANTI-SLAPP)

GPS' NPBI technology safely cleans indoor air.  This patented technology produces a high concentration of positive and negative ions, delivering them to the space via the ventilation system.  Within the air stream, ions attach to particles, where they combine, become larger, and are more easily filtered from the air.  When ions come in contact with pathogens, they disrupt the pathogens' surface proteins, rendering them inactive.

Also, according to the GPS web page and specific to viruses:



(Offermann Decl. ¶18)

**C.    The Growing Concern About Air Cleaners In The Covid-19 Era.**

The COVID-19 pandemic has caused demand for air treatment systems (ATS) to skyrocket.  To harness this demand, companies like GPS have increased marketing efforts and product lines.  Manufacturers of ATS devices, including GPS, routinely claim their devices remove more than 99% of airborne viruses and bacteria.  Many IAQ scientists examined these claims and discovered that, in many instances, the claims were false in that many of these devices provided little to no reduction of airborne air contaminants, including COVID-19, and can create harmful air contaminants.  (Offermann Decl. ¶12)

In March 2021, researchers at Illinois Tech, Portland State University, and Colorado State University published an article presenting their findings after conducting a series of tests on the efficacy of one of the ionizers sold by GPS.  The authors explained that they conducted lab tests with air sampling in a large semi-furnished chamber and in a field test with an ionizer installed in an air handling unit serving an occupied office building.  They found that (1) there was very little net effect on the overall concentration of the type of small particles that cause the greatest risk to health; and (2) both tests resulted in a decrease in some volatile organic compounds, but an increase

CARLE, MACKIE,
POWER & ROSS LLP

4

CASE NO. 21-CV-02884-JSW    DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION TO STRIKE
COMPLAINT BY PLAINTIFF (ANTI-SLAPP)

1  in others.  (Offermann Decl. ¶20)

2  Other scientists have raised similar concerns.  Rutgers civil and environmental engineering

3  professor Monica Mazurka noted in an interview that bipolar ionization systems constitute

4  "unvalidated" technology.  Dr. Sarah F. Evans, an Assistant Professor in the Department of

5  Environmental Medicine and Public Health and a member of the Institute for Exposomic Research

6  at the Icahn School of Medicine at Mount Sinai was consulted by a group of parents concerned

7  about plans to install GPS ionizers at their local school.  After reviewing the situation, Dr. Evans

8  wrote a letter to the district opposing the installation of the GPS devices.  Newark School District,

9  which had purchased more than 500 air cleaners form GPS at a cost of $360,000 decided to

10 "disconnect" them until further notice. (Offermann Decl. ¶21)

11 In May 2021, a class action lawsuit was filed against GPS alleging that GPS misrepresented

12 the effectiveness of their ionizers and that the use of these ionizers may introduce harmful

13 byproducts.  [Declaration of Arif Virji (herein "Virji Decl.") ¶1]

14 **D.    The Tests Presented On The GPS Website.**

15 GPS listed twelve tests on its website that purportedly support its position that GPS ionizers

16 reduce the indoor airborne concentrations of air contaminants.  Mr. Offermann evaluated this data

17 and reached the conclusions set forth below. Mr. Offermann was completely qualified to conduct

18 this review. He has been conducting performance tests of air cleaning devices for 30 years and

19 served an expert witness and special consultant for the U.S.  federal Trade Commission regarding

20 the performance claims found in advertisements of portable air cleaners and residential furnace

21 filters. He also provided consultation to the American Home Appliance Manufacturers (AHAM)

22 on the development of a standard for testing portable air cleaners, AHAM Standard AC-1, which

23 is used to measure the Clean Air Delivery Rates (CADR) for air cleaners.

24 **1.    Evaluation Of Particle Removal Testing – Blue Haven Technologies**

25 **Report.**

26 The first test under this report was conducted using a MERV 8 Filter along with a GPS

27 device.  The Clean Air Delivery Rate (CADR), a measurement of the rate of extraction, was 20

28 cfm (cubic feet/minute) after 14 minutes and 9 cfm after 960 minutes.  The American Home

CARLE, MACKIE,
POWER & ROSS LLP

5

CASE NO. 21-CV-02884-JSW    DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION TO STRIKE
COMPLAINT BY PLAINTIFF (ANTI-SLAPP)

Appliance Manufacturer (AHAM) recommendation is to use an air cleaner capable of a CADR equal to 2/3 of the floor area of the room where the air cleaner is installed.  Thus, the CADRs of 9 to 20 cfm measured for the MERV 8 filter + GPS translate into recommended room sizes of just 14 square feet to 30 square feet, far smaller than any classroom or even a small bedroom. For a typical classroom with code minimum outdoor air ventilation and low efficiency filters, adding a CADR cfm of  9 or 20, reduces the airborne SARS-Cov-2 exposure by just 1% and 2% respectively.  (Offermann Decl. ¶16).

The second test under this report was conducted using a MERV 13 Filter with *no* GPS device.   The CADR was 271 cfm. Applying the AHM conversion formula results in a recommended room size of 405 square feet.  Thus, the MERV 13 filter provided more than ten times removal of particulates than a MERV 8 filter with a GPS device.  (Offermann Decl. ¶16)

### 2. Evaluation of Antimicrobial Activity of Cold Plasma Generator Test.

This report tests Feline Calicivirus in petri dishes with a GPS ionizer positioned just above the petri dish's surface for 30 minutes. GPS reported that the concentration of viable viruses in the test sample was reduced by 93.5%. While a reduction of 93.5% on its face is a good result, that reduction is based upon a GPS ionizer positioned directly above an inoculated surface (i.e., the petri dish) for 30 minutes.  Taking this obvious difference into account, Mr. Offermann calculated the reduction of Feline Calicivirus in the air of the HVAC system to be just 0.0016%, a far cry from the advertised 93.5%.  (Offermann Decl. ¶16).

### 3. Pathogen Testing Reports (Four tests).

The GPS CDIFF Test Report (#1) is a test similar to the test described above with Feline Calicivirus. This test used Clostridium difficile bacteria in petri dishes with a GPS ionizer placed 5 cm (2 inches) above the petri dish's surface for 30 minutes. The concentration of viable bacteria in the test sample was purportedly reduced by 86.87%.  While a reduction of 86.87% on its face is a good result, that reduction was again based on a GPS ionizer positioned directly above the petri dish.  In an HVAC system the reduction of airborne bacteria is negligible, calculated by Mr. Offermann to be just 0.002%.  (Offermann Decl. ¶16). A far cry from the advertised 86.87% reduction.

CARLE, MACKIE,
POWER & ROSS LLP

6

CASE NO. 21-CV-02884-JSW   DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION TO STRIKE
COMPLAINT BY PLAINTIFF (ANTI-SLAPP)

The remaining three tests were airborne reduction tests of viable bacteria conducted in a test chamber. These tests show that using two GPS ionizers in a relatively small test chamber results in very small CADRs of 6-31 cfm, which translate into recommended room sizes of just 9 square feet to 35 square feet.  Again, this recommended room size is far smaller than the average classroom size these devices are advertised to protect. For a typical classroom with code minimum outdoor air ventilation and low efficiency filters, adding a CADR cfm of  6 or 31, reduces the airborne SARS-Cov-2 exposure by just 1% and 4% respectively.  (Offermann Decl. ¶16).

### 4.    Customer Site Testing Reports.

These customer field reports all lack the necessary test controls for accurate measurement of the improved air quality produced by the GPS ionization systems. Some studies only measured the indoor air contaminants with the GPS ionization system installed, and thus preclude any assessment of the improvement of the air quality created by the GPS system. Other studies that attempted to quantify the improvement of the air quality created by the GPS system by conducting measurements on different days with and without the GPS system operating lacked the measurements of the outdoor air ventilation rates and indoor contaminant emission rates that are necessary to assess the improvement of the air quality created by the GPS system. (Offermann Decl. ¶16).

### E.    The Offermann Article.

Based on these findings, Mr. Offermann wrote an article entitled *Beware The COVID-19 Snake Oil Salesmen Are Here* (the "Article").  There were no false, misleading, or otherwise defamatory statements in the Article.  Indeed, the article only states the following *facts* or *opinions*:

1.    Air cleaners, including ionizers, in general (with no reference specifically to GPS) provide little or no removal of airborne virus and *may* produce dangerous chemicals such as ozone or formaldehyde [WELL RECOGNIZED OPINION IN THE SCIENTIFIC COMMUNITY].

2.    The test results posted by GPS on its website prove that the GPS devices provide little removal/inactivation of harmful air particles from rooms, including airborne bacteria and virus (i.e. in a typical classroom with code minimum outdoor air ventilation and low efficiency filters the reduction of airborne SARS-CoV-2 exposure is just 1%-4%.) [OFFERMANN OPINION BASED ON HIS EVLAUTION OF GPS DATA].

3.    Use of mechanical outdoor ventilation, use of portable air cleaners that meet

CARLE, MACKIE,
POWER & ROSS LLP

7

CASE NO. 21-CV-02884-JSW    DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION TO STRIKE
COMPLAINT BY PLAINTIFF (ANTI-SLAPP)

AHAM standards and HVAC filters that are ASHRAE MERV rated will work far better and cost substantially less than ionizers installed in HVAC systems [WELL RECOGNIZED OPINION IN THE SCIENTIFIC COMMUNITY].

4. While outdoor air ventilation and air filtration can reduce the risk of far field airborne exposures to SARS-CoV-2 (e.g., greater than 6 feet), no amount of ventilation or air filtration can reduce risk of close exposure to an infected individual, only masks and social distancing can reduce this risk. [WELL RECOGNIZED OPINION IN THE SCIENTIFIC COMMUNITY].

(Offermann Decl. ¶19)

GPS contends that the title of the article, including the words "Snake Oil Salesman" is itself defamatory. However, an examination of this label shows the title is appropriate here. The phrase conjures up images of profiteers trying to exploit an unsuspecting public by selling fake cures to ailments. Indeed, the Oxford English Dictionary defines snake oil as "a quick remedy or panacea." Selling a quick remedy is exactly what GPS was doing. Their own test results show their devices did little to remove harmful particles from the air, yet they had a brilliant marketing campaign that promised a panacea. Moreover, just like the snake oil salesmen of the past, GPS preyed on the public, in this case vulnerable parents and school administrators desperate for ways to get kids back into schools for in person learning. It cannot be defamation if the shoe fits.

## III.   LEGAL STANDARD

### A.   This Court Has The Authority To Consider The Anti-Slapp Motion.

This Court has the authority to consider this Anti-SLAPP motion. The Ninth Circuit Court of Appeals has determined that the Anti-SLAPP Statute is substantive in nature and, therefore, a federal district court exercising diversity jurisdiction follows California's law and applies California's Anti-SLAPP Statute. *United States ex rel. Newsham v. Lockheed Missiles & Space Co.* (9th Cir. 1999) 190 F.3d 963, 972. While not explicitly stated in *Newsham*, the fact that the Ninth Circuit held that the Anti-SLAPP Statute was substantive in nature, establishes that the Anti-SLAPP Statute applies where the Federal District Court exercises supplemental jurisdiction, as the Court does here.

### B.   California Law Mandates That Slapp Claims Are Not Actionable As A Matter Of Law.

The Anti-SLAPP Statute was enacted to protect individuals from litigation brought to chill

CARLE, MACKIE, POWER & ROSS LLP

8

CASE NO. 21-CV-02884-JSW   DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION TO STRIKE COMPLAINT BY PLAINTIFF (ANTI-SLAPP)

or punish the exercise of protected rights. See Cal. Code Civ. Proc. § 425.16(a). Accordingly, the California Anti-SLAPP Statute provides as follows:

> A cause of action against a person arising from any act of that person in furtherance of the person's right to petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim. Cal. Code Civ. Proc. § 425.16(b)(1).

The critical inquiry in the Anti-SLAPP context is whether the plaintiff's claim is based on an act in furtherance of the defendant's right of petition or free speech. *Cotati v. Cashman* (2002) 29 Cal. 4th 69, 78. A defendant must demonstrate that the act underlying the plaintiff's claim fits within one of the categories set forth in California Code of Civil Procedure section 425.16(e). California Code of Civil Procedure section 425.16(e) provides that an "act in furtherance of a person's right of petition or free speech . . . in connection with a public issue includes:……(3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."

California Code of Civil Procedure section 425.16 requires the court to engage in a two-step analysis of Anti-SLAPP motions. First, the court must decide whether the defendant has made a threshold showing that the challenged act or conduct is subject to a motion to strike. *Nevallier v. Sletten* (2002) 29 Cal. 4th 82, 88-89. To satisfy this initial burden, the defendant need only show that the targeted conduct arises from activity falling into one of the categories identified in California Code of Civil Procedure section 425.16(e). *Id.*; *Equilon Enters. v. Consumer Cause, Inc.* (2002) 29 Cal. 4th 53, 58. In determining whether a defendant has met its burden, the court considers the pleadings, declarations, and matters that may be judicially noticed. Cal. Code Civ. Proc. section 425.16(b).

Once such a showing has been made, the second step of the analysis requires the Court to determine whether the plaintiff has demonstrated a probability of prevailing on the claim. *Nevallier, supra* at 88-89. The evidence presented by the plaintiff must overcome any privilege

CARLE, MACKIE, POWER & ROSS LLP

9

CASE NO. 21-CV-02884-JSW   DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION TO STRIKE COMPLAINT BY PLAINTIFF (ANTI-SLAPP)

1  or defense raised as to the claim.  *Flately v. Mauro* (2006) 39 Cal. 4th 299, 323.

2  IV.   <u>ARGUMENT</u>

3     A.     **IEE's Claims Are Based On Writings Made In Connection With An Issue Of**
4            **Public Interest.**

5        California Courts grant "public interest" an expansive definition within the meaning of the

6  Anti-SLAPP Statute. The court's ruling in *Nygard, Inc. v. Uusi-Kerttula* (2008) 159 Cal. App. 4th

7  1027, 1042 is instructive. After performing an exhaustive review of both the Anti-SLAPP Statute

8  and previous court holdings, the California Court of Appeal determined, "'an issue of public

9  interest' within the meaning of section 425.16, subdivision (e)(3) is ***any issue in which the public***

10 ***is interested***.  In other words, the issue need not be 'significant' to be protected by the Anti-SLAPP

11 statute — it is enough that it is one in which the public takes an interest." *Nygard*, *supra* at 1042

12 [emphasis original].

13       Here, the allegedly defamatory statements are ones that question whether the GPS ionizers,

14 bought with millions of taxpayer dollars, work as promised by GPS, or are simply an attempt to

15 rake in huge profits at the expense of School Districts and parents who are desperate to find

16 something that will allow kids to return safely to classrooms. There cannot be any issue that falls

17 more squarely in the category of "public interest".

18     B.     **Plaintiff Cannot Show A Probability Of Succeeding On The Merits Of Its**
19            **Trade Libel, Libel, And Slander Causes Of Action.**

20       Since IEE has satisfied its burden of showing that GPS's causes of action arise from its

21 constitutional right of free speech in connection with a public issue, GPS must demonstrate "a

22 reasonable probability" of success on the merits.  *Metabolife Int'l v. Wornick* (9th Cir. 2001) 264

23 F.3d 832, 840.

24       For a statement to be actionable in defamation, it must expressly or impliedly assert

25 objectively verifiable facts. *Milkovich v. Lorain Journal Co.* (1990) 497 U.S. 1, 19.  A reasonable

26 factfinder must be able to conclude that the statement implies an assertion of fact.  *Milkovich*,

27 s*upra*, 20-21. "The sine qua non of recovery for defamation ... is the existence of falsehood." *Letter*

28 *Carriers v. Austin* (1974) 418 U.S. 264, 283.  Because the statement must contain a provable

**CARLE, MACKIE,**
**POWER & ROSS LLP**

10

CASE NO. 21-CV-02884-JSW   DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION TO STRIKE
COMPLAINT BY PLAINTIFF (ANTI-SLAPP)

1   falsehood, courts distinguish between statements of fact and statements of opinion for purposes of

2   defamation liability.  Although statements of fact may be actionable as libel, statements of opinion

3   are constitutionally protected.  *Baker v. Los Angeles Herald Examiner* (1986) 42 Cal.3d 254, 260.

4         An opinion is actionable only "if it could reasonably be understood as declaring or

5   implying actual facts capable of being proved true or false."  *Franklin v. Dynamic Details, Inc.*

6   (2004) 116 Cal.App.4th 375, 386.  Whether a statement is a nonactionable opinion or implies a

7   provably false assertion of fact is a question of law for the court.  *Id*. at 385; *Eisenberg v. Alameda*

8   *Newspapers, Inc*. (1999) 74 Cal.App.4th 1358, 1383.  "In determining whether a statement is

9   actionable fact or nonactionable opinion," California courts utilize the "totality of the

10  circumstances" test.  See *Baker v. Los Angeles Herald Examiner* (1986) 42 Cal.3d 254, 260.  Under

11  this test, "[f]irst, the language of the statement is examined. For words to be defamatory, they must

12  be understood in a defamatory sense.... Next, the context in which the statement was made must

13  be considered."  *Id*. at 260–61.  The dispositive question is whether a reasonable factfinder could

14  conclude that the published statement implies a provably false assertion of fact. *Milkovich, supra,*

15  497 U.S. 1 at 19; *Eisenberg*, *supra*, 74 Cal.App.4th at 1383.

16        In addition, a statement of opinion based on fully disclosed facts can be punished only if

17  the stated facts are themselves false.  See *Restatement (Second) of Torts* § 566, cmt. c "A simple

18  expression of opinion based on disclosed ... nondefamatory facts is not itself sufficient for an action

19  of defamation, no matter how unjustified and unreasonable the opinion may be or how derogatory

20  it is." (emphasis added).  The rationale behind this rule is straightforward—when the facts

21  underlying a statement of opinion are disclosed, readers will understand they are getting the

22  author's interpretation of the facts presented, and they are free to agree with the author or reach

23  their own opinion on the same facts.

24        Here, the allegedly defamatory statements IEE stands accused of making are either true or

25  nothing more than the opinion of Mr. Offermann *based on his evaluation of non-defamatory data*

26  *provided by GPS.* GPS may disagree with Mr. Offermann's conclusions and even believe they are

27  derogatory, but his statements are not defamatory as they are based on data provided by GPS.

28  ///

CARLE, MACKIE,
POWER & ROSS LLP

11

CASE NO. 21-CV-02884-JSW   DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION TO STRIKE
COMPLAINT BY PLAINTIFF (ANTI-SLAPP)

C.     **Plaintiff's Causes Of Action For Product Disparagement And Violation Of Business And Professions Code § 17200 Also Arise From Activity Protected By The Anti-SLAAP Statute.**

GPS's product disparagement and unfair competition claims arise from the same defamatory statements alleged in the GPS's causes of action for trade libel, libel, and slander. Therefore, the claims are subject to the Anti-SLAPP Statute because, as explained above, the alleged defamatory statements were made in connection with an issue of public interest.

California courts have held that a claim will nonetheless be subject to the Anti-SLAPP statute "unless the protected conduct is 'merely incidental to the unprotected conduct." *Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP* (2005) 133 Cal. App. 4th 658, 672; quoting *Mann v. Quality Old Time Service, Inc*. (2004) 120 Cal. App. 4th 90, 103. In so holding, the courts have sought to ensure that a Plaintiff "cannot frustrate the purposes of the SLAPP statute through a pleading tactic of combining allegations of protected and non-protected activity under the label of one 'cause of action'" *Fox Searchlight Pictures, Inc. v. Paladino* (2001) 89 Cal App. 4th 294, 308.  Here, the defamation allegations are central to each claim, not "merely incidental," especially considering GPS affirmatively pleads that the alleged conduct is related to the Article. Accordingly, the entirety of each of GPS's product disparagement and unfair competition claims are subject to the Anti-SLAPP Statute.

D.     **Plaintiff Cannot Show A Probability Of Succeeding On The Merits Of Its Product Disparagement And Violation Of Business And Professions Code § 17200 Causes Of Action.**

Again, for Plaintiff to show that the challenged claim has a reasonable probability of succeeding at trial, Plaintiff must overcome any privilege or defense raised as to those claims. *Flately*, *supra* at 323.  As discussed in detail above, Plaintiff cannot establish a probability of succeeding on its defamation claim.

As with defamation, the *sine qua non* of recovery for product disparagement, as alleged in GPS's complaint, is the existence of falsehood.  As discussed above, GPS cannot establish a probability of providing a falsehood and succeeding on its product disparagement claim. Accordingly, since the product disparagement claim arises from the alleged defamatory communications, and GPS cannot establish the likelihood of success on its defamation claim's

CARLE, MACKIE,
POWER & ROSS LLP

12

CASE NO. 21-CV-02884-JSW   DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION TO STRIKE
COMPLAINT BY PLAINTIFF (ANTI-SLAPP)

1 merits, its claim for product disparagement also fails.

2     **E.    IEE Is Entitled To Recover Attorneys' Fees.**

3     California Code of Civil Procedure section 425.16(c) states, in part, "a prevailing defendant

4 on a special motion to strike shall be entitled to recover his or her attorney's fees and costs."

5 Therefore, IEE is entitled to the recovery of their attorneys' fees incurred to bring this motion.

6         **V.    CONCLUSION**

7     IEE respectfully requests that the Court grant this motion and dismiss Plaintiff's entire

8 Complaint with prejudice, and award attorneys' fees to IEE.

9 Dated: August 13, 2021        Respectfully submitted,

10         CARLE, MACKIE, POWER & ROSS LLP

12     By:   _____

13         Arif Virji, Esq.

14         James V. Sansone, Esq.

15         Attorneys for Defendant IEE INDOOR ENVIRONMENTAL ENGINEERING

CARLE, MACKIE, POWER & ROSS LLP

13

CASE NO. 21-cv-02884-JSW   DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION TO STRIKE COMPLAINT BY PLAINTIFF (ANTI-SLAPP)